**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

KRISTIN BEAVER,

                    Plaintiff,

             -v-                             1:25-CV-534 (AJB/PJE)

CAPITAL REGION BOCES,

                    Defendant.
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| KRISTIN BEAVER<br>Plaintiff, Pro Se<br>449 Gutha Road<br>Delanson, NY 12053 | |
| BOND, SCHOENECK & KING, PLLC<br>Attorney for Defendant<br>350 Linden Oaks, Third Floor<br>Rochester, NY 14625 | JEREMY M. SHER, ESQ. |
| BOND, SCHOENECK & KING, PLLC<br>Attorney for Defendant<br>One Lincoln Center<br>Syracuse, NY 13202 | KATE I. REID, ESQ. |

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION and ORDER

### I.    INTRODUCTION

On May 1, 2025, _pro se_ plaintiff Kristen Beaver ("plaintiff") filed this civil action against defendant Capital Region BOCES ("defendant"), her former employer, alleging violations of her rights under the U.S. Constitution, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), the Computer Fraud and Abuse Act

("CFAA"), and related state law.  Dkt. No. 1.  According to plaintiff's complaint, defendant engaged in a "pattern of retaliatory behavior," including "harassment, false allegations, and ultimately, wrongful termination," that began after she "opted out of the union" and reported "multiple incidents of student mistreatment and abuse by staff."  *See id.*

On June 9, 2025, defendant moved to dismiss under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Dkt. No. 13.  According to defendant, plaintiff has failed to plausibly allege any of her federal civil rights claims and the Court should decline to exercise supplemental jurisdiction over her state-law claims, which could be litigated in an appropriate state-court forum.  *See id*.

The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

The following facts are taken from the complaint and its attached exhibits, Dkt. No. 1, as well as a review of plaintiff's supplemental submissions, Dkt. Nos. 5, 6, 8, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and will be assumed true for the purpose of assessing the motion to dismiss.

Plaintiff started working for defendant as a nurse in October of 2017.  On May 1, 2024, she "opted out of the union, requesting paperwork through Katie DePierro, classroom teacher and union president."  Compl. ¶ 1.[1]  "Within days" of plaintiff's decision to opt out, she "began experiencing retaliation and bullying behaviors from classroom workers and close friends of the union president."  *Id*.  At some point, "classroom aide Linda Robillard" falsely accused plaintiff of pushing a student "during a behavior issue" when Ms. Robillard "yelled loudly 'Don't you push her she is having a seizure.'"  *Id*.  But Ms. Robillard did not make a formal report.  *See id*.

---

[1]  Plaintiff's complaint is sequentially numbered, but the numerals used for the first two paragraphs are repeated on page one.  Accordingly, specific citations to the pleading technically begin with the third paragraph on page one.

On May 30, 2024, plaintiff reported Ms. Robillard to defendant "because it raised serious concerns of false allegations." Compl. ¶ 1. As plaintiff explains, she "submitted a formal report to Principal Gabriel and Administrator Caralee Kardash." *Id*. She also reported Ms. Robillard to HR Director Nicole Yamin. *Id*. According to plaintiff, "[n]o investigation took place and no determination letter was received for the egregious and malicious false allegations." *Id*.

In June of 2024, plaintiff "requested break coverage" from "Kristin Blick, RN and Kathy Stone, LPN." Compl. ¶ 2. Although these co-workers agreed to cover for her, Ms. DePierro, a classroom teacher and the union president, told plaintiff "that she could only take lunch at the end of the day, after her medically fragile student left for the day at 2:20 p.m." *Id*. According to plaintiff, this "was part of a pattern of retaliation for [her] decision to opt out of the union and report workplace misconduct." *Id*.

On September 4, 2024, "Lisa Hatker," a nurse, asked plaintiff "to take responsibility for her student" at 7:45 a.m. "on the days [p]laintiff was not assigned to the bus route" so that Ms. Hatker "could leave earlier for the Career and Technical Education (CTE) school." Compl. ¶ 4. As plaintiff explains, Ms. Hatker's request "posed a liability risk" because "students were not allowed in the building until 8:05 a.m." *Id*. So plaintiff refused. *Id*. "[I]mmediately following her refusal, staff in the classroom began to treat her as though she had done something wrong." *Id*.

On September 10, 2024, plaintiff and "the other nurses" were called into a meeting with HR Director Yamin. Compl. ¶ 4. There, plaintiff learned that "her hours would be reduced by half an hour daily, five days a week." *Id*. Although plaintiff acknowledges that other nurses had their hours cut too, she alleges that Ms. Hatker's hours were reduced by slightly less even though she had fewer duties. *Id*. "When [p]laintiff questioned the rationale behind this decision," HR

Director Yamin "explained that she was reviewing all staff hours." *Id*.  According to plaintiff, these "reviews are typically handled by payroll, not HR, raising concerns about the legitimacy of the review process." *Id*.

On September 11, 2024, Ms. DePierro approached plaintiff and "abruptly took" away her "medically fragile 1:1 student without [p]laintiff's consent."  Compl. ¶ 3.  "This action was a violation of the student's Individualized Education Plan (IEP) and placed the student at medical risk due to the student's seizure diagnosis." *Id*.  According to plaintiff, she "reported the incident as it demonstrated a clear breach of protocol and put the student in a dangerous situation, as well as a violation of [p]laintiff's responsibilities under medical duty." *Id*.

On September 25, 2024, Ms. Hatker, "a nurse assigned to a medically fragile student," refused to allow the student to share a bus with another student, "despite the fact that this would have been a reasonable accommodation."  Compl. ¶ 5.  According to plaintiff, Ms. Hatker falsely claimed that this arrangement would make her late when, in reality, Ms. Hatker was "driven by personal financial gain, as it allowed her to continue receiving overlapping compensation from" defendant and another school. *Id*.  Ms. Hatker's actions created "significant hardship" for the student's family.  Compl. ¶ 5.  Although defendant was aware of Ms. Hatker's actions, it "failed to intervene or take corrective action." *Id*.  "In contrast, when [plaintiff] protected medically fragile students from a risk by ensuring proper care, [defendant] retaliated against [her]." *Id*.

On September 30, 2024, plaintiff notified defendant "by email that she was taking a few mental health days due to escalating retaliation, fear of jeopardizing her nursing career and license, as well as student mistreatment and ongoing workplace hostility."  Compl. ¶ 6.  "Despite [p]laintiff's clear health-related concerns," defendant "failed to address the retaliation or provide

any assistance in managing [her] health issues or stressors from the hostile work environment." *Id*.

On October 4, 2024, plaintiff met with HR Director Yamin and Administrator Kardash. Compl. ¶ 7. Plaintiff "formally reported the mistreatment of students, hostile work environment, and retaliation after opting out of the union, as well as escalating fear for her professional license and mental health," including Ms. Robillard's false allegation. *Id*. ¶¶ 7–8.

Plaintiff's supervisors "immediately dismissed the complaint" about Ms. Robillard, with Administrator Kardash telling her the allegation was "unfounded." Compl. ¶ 8. In addition, HR Director Yamin failed "to ask follow-up questions and take action" despite being "a mandated reporter under New York State law." *Id*.

During the meeting, plaintiff "requested an accommodation or transfer from the current working environment." Compl. ¶ 7. "Plaintiff was left with the understanding that [defendant] would investigate the reported incidents or provide the requested accommodation." *Id*.

Thereafter, plaintiff reported student mistreatment to external agencies. Dkt. No. 21-4. Beginning in October of 2024 and continuing through January of 2025, plaintiff "repeatedly requested accommodations or a transfer from her current position due to ongoing workplace harassment, hostile work conditions, and escalating retaliation." Compl. ¶ 9.

"These requests were made verbally and in writing to multiple administrators," including to HR Director Yamin and Administrator Kardash. Compl. ¶ 9. According to plaintiff, she "was consistently denied any accommodation or transfer," which "further exacerbated [her] anxiety, stress, and mental health issues." *Id*.

In October of 2024, plaintiff contacted the Equal Employment Opportunity Commission ("EEOC") for an intake interview, which referred her to the New York State Division of Human Rights ("NYSDHR"). Dkt. No. 21-1 ¶ 2.

On October 10, 2024, defendant "issued a determination letter falsely concluding that all of [p]laintiff's complaints were 'unfounded,' without conducting any formal investigation or witness interviews." Compl. ¶ 10. Plaintiff appealed this determination letter to Superintendent Lauren Gemmill, who did not respond. *Id.* ¶ 11.

On November 1, 2024, plaintiff "met with Concetta Galvin, who was introduced as an independent investigator." Compl. ¶ 12. There, plaintiff "described several incidents of student mistreatment by staff," including incidents "where students were physically mishandled" by staff members that caused the students to become "visibly upset and crying." *Id.*

On November 14, 2024, defendant issued a second determination letter "stating that reports of student abuse were unfounded, and further investigation would follow on reports of student treatment." Compl. ¶ 13. "However, no further abuse determination followed, and plaintiff was left without any meaningful response or investigation into the serious claims of student abuse." *Id.*; *see also id.* ¶ 14 (alleging plaintiff's repeated attempts to report misconduct were met with indifference by defendant's administrators).

In the Fall of 2024, plaintiff's official work e-mail account "experienced tampering and unauthorized interference." Compl. ¶ 15. As plaintiff explains, her work account "password was changed without her knowledge on November 26, 2024." *Id.* "Starting on that date, plaintiff[']s emails to [defendant's] administrators regarding absences and workplace concerns were blocked, delayed, or never delivered, without any bounce-back notifications." *Id.*; *see id.* ¶ 16 (describing irregularities with plaintiff's work e-mail account).

In December of 2024, defendant initiated disciplinary action against plaintiff by serving her with Civil Service § 75 charges.  Compl. ¶ 19.  "These charges falsely accused plaintiff of misconduct, including failure to report absences, insubordination and incompetence, despite the known email issues and hostile work environment plaintiff faced."  *Id*.  As plaintiff explains, Administrator Kardash had "previously sent a mass email" letting staff know that "absences could be reported via email."  *Id*. ¶ 18.  Plaintiff alleges that she tried to report her absences using this method but that the issues with her account interfered with these attempts.  *Id*. ¶ 17.

On January 3, 2025, HR Director Yamin telephoned plaintiff to ask whether she planned to return to her assignment.  Compl. ¶ 28.  "Plaintiff felt this question was a trick and attempted to manipulate her response."  *Id*.  "Plaintiff expressed her desire to return to her position but made it clear that she could not work with abusive staff."  *Id*.  In response, HR Director Yamin told plaintiff "that if she did not resign, she would have to attend a Civil Service § 75 hearing," which would be used to terminate her employment.  *Id*.  Plaintiff e-mailed HR Director Yamin to request that all further communication with her be done "exclusively through email."  *Id*.

On February 20, 2025, plaintiff sent "a formal demand letter via email" to defendant's legal counsel, Superintendent Gemmill, and HR Director Yamin.  Dkt. No. 19 ¶ 2.  Plaintiff's demand letter sought double backpay from the date of her termination, three years' salary, a lump sum of $100,000, and three years of health insurance coverage.  *See id*. at 5.  Defendant's counsel responded on March 6, 2025, and "formally rejected the offer, stating that [defendant] would not be negotiating a resolution."  *Id*. ¶ 3.

Thereafter, a Civil Service § 75 hearing occurred.  Compl. ¶¶ 29–43.  The hearing officer was Attorney Kristen Smith, who worked at the same law firm that represents defendant in this

litigation.  Dkt. No. 16 at 3.[2]  Plaintiff alleges that the procedures used at the hearing violated her

constitutional rights in various respects, including but not limited to the fact that she was denied

a meaningful opportunity to prepare a defense, that certain witnesses presented false testimony,

that defendant's counsel "exhibited extreme bias and bad faith," and that defendant's legal team

colluded with the hearing officer and with others to silence her.  *Id*. at 3–4; Compl. ¶¶ 29–43; *see*

*also* Dkt. Nos. 22–23, 25–26.  Plaintiff received a letter informing her that her employment had

been terminated effective April 21, 2025.  *See* Dkt. No. 18 at 3; Compl. at 1.

On May 8, 2025, a fellow nurse named Mary Ellen Pace "witnessed two serious incidents

involving student mistreatment by staff."  Dkt. No. 5.  Ms. Pace verbally reported these incidents

to Principal Barbato, who instructed her not to submit a report.  *Id*.  The next day, Ms. Pace was

removed from her work assignment.  *Id*.

On May 10, 2025, "a high-ranking administrator" approached "a current employee who is

believed to possess relevant knowledge regarding the events" in plaintiff's complaint.  Dkt. No.

6.  The employee declined to speak to the administrator, but plaintiff "now has reason to fear that

[defendant] may take retaliatory action" against this employee.  *Id*.  After plaintiff filed this civil

rights action, multiple staff members resigned from defendant.  Dkt. No. 16 at 4.

On May 27, 2025, plaintiff received an e-mail from the NYSDHR seeking to verify her

contact information "to proceed" with her complaint.  Dkt. No. 21-1¶ 3.  Later, on June 13, 2025,

plaintiff "served a formal, notarized Notice of Claim" on defendant.  *See* Dkt. No. 20 ¶ 2.

---

[2]  Pagination corresponds to CM/ECF headers.

## III.    LEGAL STANDARDS

### A.  Rule 12(b)(1)

The Federal Rules of Civil Procedure permit a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Id*.

Rule 12(b)(1) motions can be "facial" or "fact-based." *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016).  A "facial" Rule 12(b)(1) motion is "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Id*. at 56.  Under those circumstances, the plaintiff bears no evidentiary burden. *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017).  Instead, the court must determine whether the complaint and its exhibits plausibly allege facts giving rise to subject-matter jurisdiction. *Carter*, 822 F.3d at 56.

In contrast, a "fact-based" Rule 12(b)(1) motion permits a defendant to proffer evidence outside of the pleading. *See Carter*, 822 F.3d at 57.  In that scenario, the plaintiff will ordinarily need to come forward with evidence of their own to controvert the defendant's showing. *Id*.  If the defendant identifies "material and controverted" extrinsic evidence, the court "will need to make findings of fact in aid of its decision." *Id*.  However, "if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show [subject-matter jurisdiction]," the plaintiff may rely on their pleading. *Id*.

### B. Rule 12(b)(6)

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

### A. Procedural Matters

As an initial matter, plaintiff is *pro se*. That means she is not represented by an attorney. Therefore, her pleadings and filings must be held to less stringent standards than those that might be drafted by a lawyer. *See Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). As the Second Circuit has explained, *pro se* filings must be "construed liberally" with "special solicitude" and interpreted to raise the strongest claims they suggest. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

This observation helps resolve a second, related procedural matter: how should plaintiff's additional submissions be handled?  In addition to the complaint, Dkt. No. 1, plaintiff has filed fourteen other submissions (many with attached exhibits), Dkt. Nos. 5, 6, 8, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26.  Although the assigned magistrate judge granted plaintiff permission to file the first of these supplemental submissions, Dkt. No. 10, she was warned at that time that the appropriate way to further "supplement" her pleading would be to seek formal leave to amend in accordance with the Local Rules and Federal Rules of Civil Procedure, *see id*.

Plaintiff did not do that.  Thus, as defendant correctly points out, these submissions are procedurally inappropriate, notwithstanding the special solicitude given to *pro se* litigants.  *See, e.g.*, *Edwards v. I.N.S.*, 59 F.3d 5, 8 (2d Cir. 1995) (cautioning that *pro se* status does not exempt litigant from procedural rules).  Even so, the Court has examined these filings—the relevant ones have been cited in the II. Background, *supra*—in an effort to clarify the nature and sufficiency of plaintiff's claims for relief.  *Boguslavsky v. Kaplan*, 159 F.3d 715, 719 (2d Cir. 1998) ("[C]ourts may look to submissions beyond the complaint to determine what claims are presented by an uncounseled party.").

The final procedural matter that must be addressed is whether plaintiff may assert claims on behalf of others.  As defendant notes, the complaint alleges that one of the teachers breached protocol vis-à-vis a "medically fragile student" and speculates that "this could be a violation of the student's rights under the ADA" and other, related laws.  Compl. ¶ 3.  Indeed, throughout the complaint there are allegations that defendant's employees' actions or inactions with respect to its student population (or plaintiff's co-workers, such as Ms. Hatker or Ms. Pace) might violate one or more disability-related laws or other legal requirements.  *See, e.g.*, *id*. ¶ 5.

To the extent that plaintiff intended to assert one or more claims on behalf of others, the law makes it clear that she cannot do so.  First, it would run afoul of the rules governing *pro se* litigation in federal court.  *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) ("[B]ecause *pro se* means to appear for one's self, a person may not appear on another's behalf in the other's cause.").  Second, it would violate a separate-but-related legal principle known as "standing," which sharply "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Although there are limited exceptions to these rules that will sometimes allow a person to assert a claim on behalf of another, they do not apply in this case.  *See, e.g.*, *Deabold v. Brennan*, 2024 WL 3835173, at *4 (E.D.N.Y. Aug. 15, 2024) (finding disability advocate lacked standing to assert disability-related claims on behalf of others, including injured students).  Accordingly, any claims that plaintiff has asserted on behalf of others—or put differently, any claims that might be based on harm to others that plaintiff observed or reported—must be dismissed.[3]

### B.  The Merits

Broadly construed, plaintiff's complaint alleges violations of her own civil rights under the CFAA, the ADA, the Rehabilitation Act, the U.S. Constitution, and related state law.

### 1.  CFAA

Plaintiff invokes the CFAA.  Among other things, she speculates that the change to her account password "without her consent or knowledge and the resulting tampering of her work email account may also implicate violations of the CFAA."  Compl. ¶ 17; *see also* Dkt. Nos. 16, 22-1, 22-4.

---

[3] Because standing is a jurisdictional limitation, this is a 12(b)(1) subject matter dismissal.  *See, e.g.*, *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020).

"Congress originally enacted the CFAA in 1984 to criminalize the then-novel problem of hacking." *Hancock v. County of Rochester*, 882 F.3d 58, 63 (2d Cir. 2018). Although the statute was later amended to provide a civil cause of action, *Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015), the CFAA only imposes liability on an individual who "obtains or alters information that he does not have authorization to access for any purpose which is located on a computer that he is otherwise authorized to access," *United States v. Valle*, 807 F.3d 508, 511 (2d Cir. 2015).

Because the civil component of the CFAA is derivative of conduct covered under the criminal statute, 18 U.S.C. § 1030(g), "district courts have consistently looked to whether the person had authorized access" to determine whether the plaintiff could plausibly allege a civil CFAA claim. *See, e.g.*, *Deutsch v. Hum. Res. Mgmt., Inc.*, 2020 WL 18776761, at *3 (S.D.N.Y. Apr. 15, 2020) (collecting cases). The Supreme Court has endorsed this narrower reading of the statute. *Van Buren v. United States*, 593 U.S. 374, 396 (2021) (holding that "exceeds authorized access" does not include otherwise-authorized access that is used "for an improper purpose").

Plaintiff's complaint and supporting submissions do not plausibly allege a claim under this body of law. Liberally construed, plaintiff alleges that an unidentified actor employed by defendant tampered or interfered with her "work e-mail account" by changing the password without her knowledge or permission, which caused her e-mails to defendant's administrators about "absences and workplace concerns" to be "blocked, delayed, or never delivered without any bounce back notifications." Compl. ¶ 15.

The problem for plaintiff is that there is no plausible indication that defendant—whether acting through its IT personnel or some other administrator—lacked authorization to access and change the work e-mail that it provided to plaintiff as a benefit of her employment. Authorized conduct, even if undertaken with an improper motive, does not violate the CFAA. Under those

circumstances, plaintiff cannot plausibly allege a CFAA claim.  *See, e.g.*, *Speckman v. Fabrizio*, 547 F. Supp. 3d 239, 247 (N.D.N.Y. 2021) (dismissing civil claim where account administrators allegedly changed plaintiff's passwords without his permission).  Accordingly, plaintiff's CFAA claim must be dismissed.

### 2.  Federal Disability Statutes

Plaintiff's complaint alleges that defendant violated the ADA and the Rehabilitation Act. Although defendants' briefing understandably takes the view that plaintiff has only asserted the Rehabilitation Act claims on behalf of students (which must be dismissed, for reasons explained *supra*), in light of her *pro se* status the Court will also consider whether plaintiff can assert any Rehabilitation Act claims herself.

The ADA and the Rehabilitation Act protect the rights of individuals with disabilities in various contexts, including employment.  *See, e.g.*, *Porter v. Dartmouth-Hitchock Med. Ctr.*, 92 F.4th 129, 147 (2d Cir. 2024).  But neither statute provides for individual liability, at least in the employment context.  *Yerdon v. Poitras*, 120 F.4th 1150, 1155 (2d Cir. 2024) (ADA); *Garcia v. S.U.N.Y. Health Scis. Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001) (Rehabilitation Act).  Accordingly, the appropriate defendant for employment claims brought under these disability statutes is the plaintiff's employer.  *See, e.g.*, *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 535 (N.D.N.Y. 2021).

Although there are several distinctions between them, the ADA and the Rehabilitation Act impose broadly similar legal requirements.  *See, e.g.*, *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003) (explaining statutes are remedial and should be construed broadly).  Therefore, courts will often

"look to caselaw interpreting one statute to assist [ ] in interpreting the other." *Francis v. City of Meriden*, 129 F.3d 281, 284 n.4 (2d Cir. 1997).

Claims under these statutes can include disparate treatment, *Natofsky v. City of N.Y.*, 921 F.3d 337, 345 (2d Cir. 2019), a failure to reasonably accommodate, *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995), a hostile work environment, *see Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019), and retaliation, *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024).

As an initial matter, defendant correctly argues that plaintiff's ADA claims—under any of these or other available theories—are subject to dismissal because she has failed to plausibly allege that she exhausted them first. The ADA requires a plaintiff to exhaust her administrative remedies before filing suit in federal court. 42 U.S.C. § 12117(a). Generally, this entails filing a timely complaint with the EEOC or the appropriate state or local agency and then receiving a so-called "right to sue" letter. *See, e.g.*, *Soules v. Conn. Dep't of Emer. Servs. & Pub. Prot.*, 882 F.3d 52, 57 (2d Cir. 2018).

Exhaustion is an affirmative defense, *Zerilli-Edelglass v. N.Y. City Trans. Auth.*, 333 F.3d 74, 80 (2d Cir. 2003), which means that a plaintiff is not necessarily required to demonstrate it at the pleadings stage, *Jones v. Bock*, 549 U.S. 199, 216 (2007). Even so, pre-answer dismissal on exhaustion grounds may be appropriate when it is clear from the face of the complaint and other incorporated documents that a plaintiff has not exhausted her administrative remedies prior to filing suit. *See, e.g.*, *Hendrix v. Pactiv LLC*, 488 F. Supp. 3d 43, 52 (W.D.N.Y. 2020).

In this case, plaintiff has indicated that she had an intake interview with the EEOC, which referred her to the NYSDHR. Dkt. No. 21-1 ¶ 2. Plaintiff's other filings further indicate that her administrative complaint with the NYSDHR is still pending with the agency, at least as of May

27, 2025.  Dkt. No. 21-1 ¶ 3.  Accordingly, plaintiff's ADA claims must be dismissed without prejudice at this time.

This leaves plaintiff's disability-related claims under the Rehabilitation Act.  Unlike the ADA, most courts hold that the Rehabilitation Act does not impose an administrative exhaustion requirement for employment claims brought by non-federal employees.[4]  *Compare, e.g.*, *Earl v. Good Samaritan Hosp.*, 625 F. Supp. 3d 292, 302 (S.D.N.Y. 2022) (collecting cases holding that exhaustion is not required), *with Brown v. Bd. of Educ. of City of New Britain*, 107 F. Supp. 3d 232, 236 (D. Conn. 2015) (suggesting exhaustion might be appropriate in a case where a parallel remedy is available under a statute with an exhaustion requirement).

However, plaintiff's Rehabilitation Act claims are still subject to dismissal.  To the extent that plaintiff might have intended to allege one or more claims for disparate treatment, a failure to accommodate, and/or a hostile work environment, all three of those theories of relief require the plaintiff to plausibly allege that she was either "disabled" or "regarded as disabled" within the meaning of the statute.  *See, e.g.*, *Smith v. Hoan*, 794 F.3d 249, 253 (2d Cir. 2015).

Although these definitions are construed broadly, *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 392 (E.D.N.Y. 2016), they are not without limit.  Plaintiff's filings make a number of references to her workplace "stress" or "anxiety" and concerns for her "mental health."  But these generalized allegations, absent more information, are not enough to plausibly establish that plaintiff qualified as "disabled," or that defendant regarded her as being "disabled," within the meaning of either the ADA or the Rehabilitation Act.  *See, e.g.*, *Brown v. Fat Dough Inc.*, 2024 WL 1345360, at *7–*8 (N.D.N.Y. Mar. 29, 2024) (dismissing *pro se* plaintiff's ADA

---

[4] Section 504 of the Rehabilitation Act only applies to an employer who receives federal funds.  *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995).  The Court assumes without deciding that defendant receives federal funds for purposes of this round of motion practice.

claims without prejudice because he failed to allege a qualifying disability); *Earl*, 625 F. Supp. 3d at 303–07 (concluding same as to *pro se* litigant's Rehabilitation Act claims).

Plaintiff's retaliation claims are also insufficiently alleged. Unlike these other theories of relief, a claim for retaliation is focused on whether the employee engaged in "protected activity" that caused the employer to take an "adverse action" against her. *Natofsky*, 921 F.3d at 353. The inquiries into what counts as a "protected activity" and what qualifies as an "adverse action" are typically considered fact- and context-specific. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (adverse action); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (protected activity).

An employee engages in "protected activity" when she has a good faith, reasonable belief that the act about which she has complained violated the governing law. *See Sharikov*, 103 F.4th at 170. An employer takes an "adverse action" by responding to this protected activity in a way that might dissuade "a reasonable worker from making or supporting a charge of discrimination." *Anderson v. City of N.Y.*, 712 F. Supp. 3d 412, 433 (S.D.N.Y. 2024) (cleaned up).

The problem with plaintiff's retaliation claims is that, as they are currently pleaded, these claims fail to plausibly allege sufficient non-conclusory factual matter to assess whether there is any causal connection between what plaintiff complained about, when she complained about it, how she did so, to whom, what, if anything, defendant or its representatives might have done in response to the complaint or complaints, and whether it reasonably appeared that the substance of the complaint or complaints was a matter covered by the ADA or the Rehabilitation Act.

Although plaintiff repeatedly claims and alleges that her co-workers or other employees engaged in "retaliation" or a "pattern of retaliation" against her, it is unclear from the allegations in the pleading how any particular instance of "protected activity" might be related to any other

event that she has described.  This conclusion holds true even when you account for the fact that a causal connection between "protected activity" and "adverse action" can be established "either directly or indirectly."  *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 127 (D. Conn. 2020).

For instance, plaintiff alleges that "classroom workers" and "close friends" of the union president" began retaliating against "within days" of plaintiff's decision to opt out of the union. But the complaint does not identify any adverse action that was taken against her—at least, not one fairly attributable to defendant—that might be causally related to this decision.  Things like Ms. DePierro's alleged decision to "abruptly" take away plaintiff's "medically fragile" student, absent something more, would not qualify as an actionable retaliation claim because it does not qualify as an adverse action.  Nor would Ms. Hatker's alleged creation of "significant hardship" for another student.  And although plaintiff alleges that she suffered a reduction in her hours, she concedes that the other nurses received the same reduction (except for Ms. Hatker, who fared a little better).  Absent more, this is not enough to raise a minimal inference of retaliatory animus.

Likewise, although plaintiff complains that no internal investigation happened after she reported Ms. Robillard, and that other alleged misconduct that plaintiff brought to management's attention was either not investigated or inadequately investigated (resulting in incorrect findings), there is no plausible indication that defendant took a particular retaliatory action against plaintiff in response to one or more of those reports.  *See, e.g.*, *Fincher*, 604 F.3d at 721–22 (observing employer's failure to investigate a report is generally insufficient to establish a retaliation claim).

"Affirmative efforts to punish a complaining employee are at the heart of any retaliation claim."  *Fincher*, 604 F.3d at 721 (citation omitted).  The only action that would clearly fit under this general rubric would be the formal disciplinary action that defendant initiated at some point after all of these events occurred.  There is some indication in the pleading that this disciplinary

proceeding occurred after plaintiff notified defendant "by email that she was taking a few mental health days," but it is hard to draw any causal inference between these events because plaintiff *also* alleges that, unbeknownst to her, her e-mails were not being received by defendant because of an issue with her work account.

And while plaintiff alleges that she asked for an "accommodation" and/or a "transfer" on various occasions, it is unclear on these facts what "adverse action" defendant might have taken against her in response to one or more of those requests. If you flip the order of events and try to analyze whether a denied accommodation or transfer might be the "adverse action," it is unclear what the related "protected activity" might have been. Further, there is no plausible indication that a vacancy existed into which plaintiff might have been transferred or reassigned. In short, absent more information, plaintiff has not plausibly alleged a retaliation claim.

At the pre-answer stage, the Second Circuit has explicitly cautioned trial courts that the context-specific nature of retaliation claims means that a causal relationship can sometimes be inferred from the bigger picture, *e.g.*, the background facts about the work environment that are alleged in the pleading. *Duplan v. City of N.Y.*, 888 F.3d 612, 626 (2d Cir. 2018). But even in the context of a motion to dismiss, the plaintiff must identify non-conclusory factual allegations plausibly tending to show that one event, *i.e.*, some "protected activity" could be connected to another, later event, *i.e.*, some "adverse action." Accordingly, plaintiff's claims under the ADA and the Rehabilitation Act must be dismissed.

### 3. U.S. Constitution

Plaintiff alleges that defendant's actions violated her rights under the First and Fourteenth Amendments to the U.S. Constitution. Compl. ¶¶ 10, 13, 42. Plaintiff contends that defendant violated her free speech rights by retaliating against her "for raising matters of public concern,"

*id*. ¶ 42, and violated her due process rights by failing to investigate her complaints and issue a "correct" or "adequate" determination, *id*. ¶¶ 10, 13.

The First Amendment protects public employees against retaliation when they engage in speech on certain issues. *See, e.g.*, *Heim v. Daniel*, 81 F.4th 212, 221 (2d Cir. 2023). But public employee speech is unprotected when, *inter alia*, public employees make statements pursuant to their official duties. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

Likewise, the Fourteenth Amendment's Due Process clause protects against "arbitrary" government action, whether it arises from the "denial of fundamental procedural fairness or in the exercise of power without any reasonable justification." *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (cleaned up). But procedural due process is about a process; it does not guarantee a satisfactory, or even correct, outcome. *See, e.g.*, *Patrick v. Success Acad. Charter Sch., Inc.*, 354 F. Supp. 3d 185, 203 (E.D.N.Y. 2018) (collecting cases).

The applicable body of law for these claims is 42 U.S.C. § 1983, which is the procedural vehicle used to enforce a plaintiff's constitutional rights. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). But because the constitution's individual guarantees only operate against the government, *Lindke v. Freed*, 601 U.S. 187, 195 (2024), the § 1983 statute can only reach "state action" by state actors, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001). In other words, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

This makes § 1983 different than the ADA or the Rehabilitation Act. In the employment context, those statutes protect plaintiff-employees from defendant-employers. But § 1983 is not

focused on the employment relationship.  Instead, "[t]he purpose of § 1983 is to deter state actors

from using the badge of their authority to deprive individuals of their federally guaranteed rights

and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161

(1992).

This means the appropriate defendant in a § 1983 action is usually the individual state or

local official who personally deprived the plaintiff of a constitutional right. *Vance v. Peters*, 97

F.3d 987, 991 (7th Cir. 1996) (citation omitted) ("Section 1983 creates a cause of action based

on personal liability and predicated upon fault."), *cert. denied*, 520 U.S. 1230 (1997); *Wiggins v.

Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) ("To establish a Section 1983 violation, a plaintiff must

plead (and later prove) that each defendant was personally involved in the alleged constitutional

violation.").

Plaintiff has not named any individual as a defendant.  Although she does reference a co-

worker, teachers, and several people who might be managers or supervisors, the complaint does

not allege in any level of meaningful detail what one or more of these individuals personally did

or refused to do that might have deprived plaintiff of a constitutional right.

Although there are a few situations in which an entity is the appropriate defendant for a §

1983 claim, *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013), a municipal entity "cannot be

held liable under § 1983 merely because it happened to employ the alleged tortfeasor." *Crawley

v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020).  Instead, the plaintiff must allege

that a policy or custom attributable to defendant caused that entity's representative to commit the

alleged constitution violation. *See Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011).  Absent a

policy or custom as the driving force behind the harm, a § 1983 claim should be brought against

the individual who committed the allegedly wrongful act.

Plaintiff has not done so. To the extent that plaintiff's complaint might be understood to assert a First Amendment retaliation claim based on speech, that claim works in a similar fashion to a retaliation claim under the two disability statutes: plaintiff needs to plausibly allege specific protected speech, followed by a specific adverse action or actions, and some non-conclusory factual matter that suggests a causal relationship between those events. *Heim*, 81 F.4th at 221.

As currently alleged, a § 1983 First Amendment retaliation claim must be dismissed for the same reasons that the disability retaliation claims were dismissed above—the Court needs more information about the speech at issue, to whom it was directed, and what, if anything, happened afterward.

To the extent that the complaint asserts a Fourteenth Amendment due process claim based on defendant's failure to investigate, or failing to adequately investigate, her complaints, courts have repeatedly concluded that the due process clause does not provide an affirmative right to an investigation.[5] *See, e.g.*, *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008). Accordingly, plaintiff's § 1983 claims must be dismissed.

**4. State-Law Claims**

Plaintiff asserts a number of state-law claims. This Court has "supplemental jurisdiction" over plaintiff's state-law claims because both parties are domiciled in New York. *See, e.g., Van Buskirk v. United Grp.*, 935 F.3d 49, 53–54 (2d Cir. 2019) (explaining citizenship for purposes of the jurisdictional statutes); *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (explaining contours of supplemental jurisdiction). However, when a federal court has

---

[5] Under limited circumstances, a plaintiff covered by Civil Service Law § 75 can assert a procedural due process claim related to the hearing. *See O'Neill v. City of Auburn*, 23 F.3d 685, 688 (2d Cir. 1994). But where, as here, the plaintiff received pre-termination process, any procedural inadequacies in the hearing must typically be aired in a state-court Article 78 proceeding rather than in a federal court. *See, e.g.*, *Marentette v. City of Canandaigua*, 351 F. Supp. 3d 410, 419–32 (W.D.N.Y. 2019); *Taylor v. Green Cent. Sch. Dist.*, 2023 WL 8654261, at *4 (N.D.N.Y. Dec. 13, 2023).

dismissed all of the claims over which it has original jurisdiction (*i.e.*, the federal-law claims), the court should decline to exercise supplemental jurisdiction over the remaining state-law ones. *See, e.g.*, *Kolari v. New York-Presbyterian Corp.*, 455 F.3d 118, 122 (2d Cir. 2006). Because all of plaintiff's federal-law claims are being dismissed, the Court declines to exercise supplemental jurisdiction over her state-law claims. Accordingly, plaintiff's state-law claims will be dismissed without prejudice.

### C.  Leave to Amend

The final question is whether plaintiff should be given an opportunity to try to amend her pleading. "Generally, leave to amend should be freely given, and a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that [she] has a valid claim." *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (cleaned up). "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

Plaintiff will be granted partial leave to amend. Plaintiff cannot allege claims on behalf of others. Nor can she plausibly allege a civil claim under the CFAA. So those claims must be dismissed *without* leave to amend. However, plaintiff might be able to plausibly allege a claim or claims under the ADA, the Rehabilitation Act, or 42 U.S.C. § 1983. So those claims will be dismissed *with* leave to amend. If plaintiff chooses to replead any of these claims, she may also attempt to replead her state-law claims at that time.

If plaintiff chooses to amend, she must include sufficient non-conclusory factual detail to enable the Court to determine whether she has plausibly alleged one or more of her claims under the law governing them that has been discussed in this opinion. To do so, she must set forth the facts that give rise to each of those claims, including the dates and places of the alleged acts, and

an explanation of how each individual committed each wrongful act. In sum, plaintiff should endeavor to write an amended pleading that contains a single, clear, relatively detailed history of the events that occurred and that describes, with non-conclusory supporting factual detail in a sequential series of numbered paragraphs, how each defendant was involved in each act.

Plaintiff is cautioned that there can only be one so-called "operative" pleading at a time. *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977). This means that if she chooses to file an amended pleading, it will replace the previous complaint in its entirety. In other words, the amended complaint cannot rely upon any other materials that have been previously filed with the Court (such as her supplemental submissions). Instead, the amended complaint must be a single document (although plaintiff can attach exhibits to this new document, as she has done with her initial complaint).

Finally, plaintiff is cautioned that the Court's docket is not a free space for litigants to file anything about the case that comes to mind. The Court reviewed plaintiff's additional filings in this round of motion practice, but virtually all of these submissions were procedurally improper. If plaintiff files an amended complaint, it must be a single document (as explained above). If she seeks additional relief, it must come in the form of a single motion that complies with the Local Rules and the Federal Rules of Civil Procedure. If she seeks to oppose a motion filed by another party, that opposition submission must be a single filing, too. In other words, while attachments to proper filings are acceptable, *seriatim* filings that violate the rules are not. Any submissions that violate the Local or Federal Rules may be struck from the docket, which would mean that the Court would not consider them.

## V.    CONCLUSION

Therefore, it is

ORDERED that

1. Defendant's motion to dismiss (Dkt. No. 13) is GRANTED;

2. Plaintiff's complaint is DISMISSED with partial leave to amend;

3. Plaintiff's motion for leave to file electronically (Dkt. No. 17) is DENIED as moot;

4. Plaintiff shall have THIRTY DAYS in which to file and serve[6] an amended complaint;

5. Any amended complaint must conform to the instructions set forth above;

6. If plaintiff timely files an amended complaint, the Clerk of the Court is directed to reset the appropriate deadlines; and

7. If plaintiff does not file an amended complaint, the Clerk of the Court is directed to enter a judgment dismissing this action without further Order of the Court.

The Clerk of the Court is directed to terminate the pending motions and set a deadline for amendment.

**IT IS SO ORDERED.**

Dated:  November 14, 2025
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge

---

[6]  Service of the amended complaint via CM/ECF is acceptable as to defendant Capital Region BOCES.  N.D.N.Y. L.R. 15.1(c).  If plaintiff chooses to name additional defendants, she is obligated to serve them in accordance with Rule 4 of the Federal Rules of Civil Procedure.  *See id.*