**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

KRISTIN BEAVER,

Plaintiff,

-v- 1:25-CV-534 (AJB/PJE)

CAPITAL REGION BOCES,

Defendant.

**Hon. Anthony Brindisi, U.S. District Judge:**

# DECISION and ORDER

## I. INTRODUCTION

On May 1, 2025, *pro se* plaintiff Kristin Beaver ("plaintiff"), a licensed practical nurse ("LPN"), filed this civil rights action against defendant Capital Region BOCES ("defendant"), her former employer, alleging violations of her rights under the U.S. Constitution, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), the Computer Fraud and Abuse Act ("CFAA"), and related state law. Dkt. No. 1.

On June 9, 2025, defendant moved to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. Dkt. No. 13. There, defendant argued that plaintiff had failed to plausibly allege any federal constitutional or statutory claims. *Id*. Consequently, defendant invited the Court to dismiss those claims and to decline to exercise supplemental jurisdiction over plaintiff's state-law claims, which could be litigated in a state-court forum. *Id*. Plaintiff opposed. Dkt. Nos. 16–26.

On November 14, 2025, the Court granted defendant's motion to dismiss but, in light of plaintiff's *pro se* status, granted her partial leave to amend. *Beaver v. Capital Region BOCES*,

2025 WL 3182723 (N.D.N.Y.); *see also* Dkt. No. 30 at 23. There, the Court explained to plaintiff that, as a non-lawyer, she could not pursue claims on behalf of others. *Id.* The Court further concluded that plaintiff could not plausibly allege a civil claim under the CFAA. *Id.* Therefore, the Court dismissed those claims *without* leave to amend. *Id.*

At the same time, however, the Court believed that plaintiff might be able to plausibly allege one or more claims under the ADA, the Rehabilitation Act, and/or 42 U.S.C. § 1983, the federal statute used to enforce violations of the U.S. Constitution. *Beaver*, 2025 WL 3182723; Dkt. No. 30 at 23. Accordingly, the Court dismissed those claims *with* leave to amend. *See id.*

As relevant here, the November 14 Order outlined for plaintiff the general contours of these areas of substantive federal law (*i.e.*, 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act) and offered plaintiff a set of instructions about how to go about repleading one or more of these federal-law claims in accordance with the relevant procedural law, *i.e.*, the Federal Rules of Civil Procedure and the Northern District of New York's Local Rules. *See id.*

On December 4, 2025, plaintiff filed an amended complaint that asserted retaliation claims under the ADA and 42 U.S.C. § 1983. Dkt. Nos. 34, 36 (corrected). But right after the Court granted defendant's request for a thirty-day extension of time in which to respond, Dkt. No. 38, plaintiff moved for leave to further amend, *i.e.*, to file a *second* amended complaint, Dkt. No. 39. Defendant opposed plaintiff's motion for leave to further amend, arguing that plaintiff's proposed second amended complaint was procedurally deficient and substantively futile. Dkt. No. 42.

On August 5, 2026, the Court rejected defendant's arguments and granted plaintiff's motion to further amend. Dkt. No. 45. At that time, the Court accepted plaintiff's second amended complaint for filing, directed the Clerk of the Court to docket the second amended complaint as

the operative pleading in this action, and set a deadline for defendant to file and serve a responsive pleading. Dkt. No. 45.

On August 19, 2026, defendant moved for partial dismissal of the second amended complaint under Rule 12(b) of the Federal Rules of Civil Procedure. Dkt. No. 48. The motion has been fully briefed, Dkt. Nos. 50, 53, and will be considered on the basis of the submissions without oral argument.[1]

## II. BACKGROUND

The following is a restatement of the facts alleged in plaintiff's second amended complaint. These facts were already recited in the Court's most recent opinion issued on August 5, 2026 (and have been copied-and-pasted here) to serve as a guide for the analysis.[2] Dkt. No. 45. These facts will be assumed true for the purpose of assessing defendant's motion to dismiss.

Plaintiff worked for defendant as an LPN during the relevant time period. Dkt. No. 39 at 6. In the spring of 2024, she repeatedly witnessed classroom aides (including an aide named Linda Robillard, more on this individual in a moment) engage in "abusive conduct toward disabled students," including forceful pulling, throwing students into chairs or beanbags, improper restraint, slapping, hair-pulling, and physically unsafe handling. Dkt. No. 39 ¶ 2. Plaintiff, who is a mandated reporter under state law, reported these incidents to administrators, including Principal Gabriel Barbatos, Administrator Caralee Kardash, HR Director Nicole Yamin, and Superintendent Lauren Gemmill. *Id.* ¶¶ 1, 3–4, 7.

---

[1] After briefing was closed, plaintiff moved for leave to file a "limited supplemental submission" that, in her view, contains "official documents directly relevant to the Monell final-policymaker issue already raised by Defendant and addressed in Plaintiff's opposition papers." Dkt. No. 54. In light of plaintiff's *pro se* status, this motion will be granted. Plaintiff's supplemental submission is discussed *infra*.

[2] Because this is merely a restatement of the facts from the August 5, 2026 Order, the citations remain to the proposed version of the pleading that plaintiff offered as part of her submissions at Dkt. No. 39. As noted, the Clerk has docketed this filing as the operative pleading at Dkt. No. 46.

Between May of 2024 and February of 2025, plaintiff "repeatedly informed administrators that no investigations were being conducted, no documentation was created, and no notifications were made to parents, home school districts, or NYSED, despite mandatory requirements under BOCES Policy 9620." Dkt. No. 39 ¶¶ 5, 7. Accordingly, plaintiff reported that the administrators themselves were "violating state-law reporting obligations, suppressing her disclosures, and retaliating against her for escalating concerns when internal procedures failed." *Id.* ¶¶ 6, 8.

However, after plaintiff's attempts to make internal reports were "repeatedly suppressed," plaintiff "escalated" her concerns "externally" to CPS, NYSED, and law enforcement. Dkt. No. 39 ¶ 9. According to plaintiff, these reports "addressed BOCES administrators' failures to follow mandatory reporting laws, their suppression of abuse disclosures, and their retaliation against Plaintiff for raising concerns." *Id.*

On May 1, 2024, plaintiff opted out of union membership. Dkt. No. 39 ¶ 10. She notified defendant's HR department and Katie DePierro, the union president. *Id.* Shortly thereafter, plaintiff was "effectively denied a meaningful lunch break." *Id.* ¶ 11. As plaintiff explains, she approached RN Kristen Blick and LPN Kathy Stone to ask if they could cover her lunch period. *Id.*

Although both co-workers "immediately agreed," Union President DePierro "intervened" and informed plaintiff that she could not take her lunch "until after her medically fragile student left for the day at approximately 2:20 p.m.—leaving only twenty-five minutes before the workday ended at 2:45 p.m." Dkt. No. 39 ¶ 11. "As a result, Plaintiff was not permitted to take a lunch break until the very end of the day, which was not consistent with policy." *Id.* Plaintiff reported this to defendant's administration, but no action was taken. *Id.*

On May 30, 2024, Union President DePierro's long-time classroom aide Linda Robillard made a "false accusation" against plaintiff: she abruptly shouted across the classroom "Don't push

her—she is having a seizure," even though the student was not having a seizure and plaintiff had not pushed the student. Dkt. No. 39 ¶ 12. Plaintiff reported this false accusation by e-mail to Principal Barbatos and Administrator Kardash. *Id.* However, no action was taken. *Id.*

On May 31, 2024, plaintiff met with Principal Barbatos to report Robillard's false accusation. Dkt. No. 39 ¶ 13. There, plaintiff attempted to explain to Principal Barbatos "the serious implications it could have on Plaintiff's nursing license." *Id.* According to plaintiff, Principal Barbatos responded that "I don't know if this makes you happy, but Linda didn't report it." *Id.* Plaintiff alleges that no investigation was conducted as a result of this report. *Id.*

On June 4, 2024, plaintiff spoke to HR Director Yamin by telephone and again reported Robillard's false accusation. Dkt. No. 39 ¶ 14. Administrator Kardash was present and listened in during this call even though plaintiff was led to believe otherwise. *Id.* Others may have been present as well. *See id.* In any event, HR Director Yamin also told plaintiff that "Linda did not report it." *Id.* Plaintiff alleges that no investigation was conducted as a result of this report. *Id.*

In early September of 2024, LPN Lisa Hatker and Union President DePierro met with plaintiff and asked her to assume responsibility for a medically fragile student at approximately 7:45 a.m., *i.e.*, "before school opened and before any other medical or supervisory support were present." Dkt. No. 39 ¶ 15. According to plaintiff, this "violated protocol, placed the student at risk, and exposed Plaintiff's nursing license to serious jeopardy." *Id.* Plaintiff expressed this view during the meeting, which caused staff members to become "visibly frustrated." *Id.* ¶ 16. Plaintiff felt "targeted and uncomfortable" and left the room. *Id.* Union President DePierro followed her but plaintiff "declined to engage." *Id.* Shortly after these events, "hostility toward Plaintiff intensified and culminated in adverse administrative action." *Id.* ¶ 17.

On September 10, 2024, plaintiff was called into a meeting with Administrator Kardash, HR Director Yamin, and Superintendent Gemmill. Dkt. No. 39 ¶ 18. At this meeting, plaintiff "was handed a written notice stating that her schedule would be reduced by 30 minutes per day, five days per week, effective September 1, 2024." *Id.* According to plaintiff, "[n]o legitimate justification was provided for the sudden reduction in Plaintiff's hours," which occurred "just days after Plaintiff refused the unsafe early-arrival assignment involving a medical fragile student and after staff displayed visible frustration with her insistence on following safety protocols." *Id.* ¶ 19.

On September 30, 2024, plaintiff e-mailed defendant's administrators to explain that "she was experiencing extreme anxiety, workplace hostility, and emotional distress caused by un-addressed abuse reports and escalating retaliation." Dkt. No. 39 ¶ 20. According to plaintiff, she "requested help, support, and intervention." *Id.*

On October 2, 2024, plaintiff e-mailed Administrator Kardash a second time, stating that she was "extremely stressed and anxious." Dkt. No. 39 ¶ 21. Plaintiff requested a meeting "to resolve the ongoing safety and workplace issues before returning." *Id.* According to plaintiff, she informed Administrator Kardash that "she had met with a mental-health professional" and "ex-plicitly wrote, 'Can I please ask for support on this issue?'" *Id.*

On October 4, 2024, plaintiff met with Administrator Kardash and HR Director Yamin. Dkt. No. 39 ¶ 22. At this meeting, plaintiff reported additional incidents of abuse and unsafe conduct involving staff. *Id.* Plaintiff also explained the emotional and psychological strain caused by witnessing these unaddressed safety violations. *Id.* Plaintiff further requested "reassignment or reasonable accommodation due to [her] worsening anxiety" and "stated she could not safely continue working in the assigned classroom under the current conditions." *Id.*

HR Director Yamin took handwritten notes during this meeting but later issued an "official determination" that failed to include plaintiff's mental health disclosures, her accommodation request, or her reports of student abuse. Dkt. No. 39 ¶ 24. According to plaintiff, defendant failed to engage in the interactive process required by the ADA because HR Director Yamin did not ask plaintiff about her limitations, explore any possible accommodations, did not discuss reassignment options, and did not follow up on plaintiff's health-related concerns. *Id.* ¶ 25.

On October 9, 2024, plaintiff e-mailed Administrator Kardash and HR Director Yamin. Dkt. No. 39 ¶ 26. In that e-mail, plaintiff stated: "I am looking forward to returning to work. However, I cannot safely continue in the assigned classroom. Will an accommodation be made?" *Id.*

On October 11, 2024, HR Director Yamin e-mailed plaintiff and informed her that "there are no vacant LPN positions." Dkt. No. 39 ¶ 27. According to plaintiff, this was false because defendant's "board documentation" from October 17, 2024 showed that an LPN resignation had been submitted. *Id.*

On October 15, 2024, defendant issued a written "determination" that framed plaintiff's "entire situation" as "negative interactions with coworkers" and disregarded plaintiff's "detailed abuse disclosures" and ignored her "requests for accommodation." Dkt. No. 39 ¶ 28. According to plaintiff, these "omissions and false statements" show that defendant "intentionally disregarded" her "accommodation requests and reports," which contributed "directly to the escalating retaliation." *Id.* ¶ 29.

On October 16, 2024, plaintiff e-mailed Superintendent Gemmill seeking to "appeal" the October 15, 2024 determination and to request an independent investigation. Dkt. No. 39 ¶ 30. In this e-mail, plaintiff "reported in detail that aides were bullying and retaliating against her," stated

that "she had been falsely accused in a way that jeopardized her nursing license," explained that "witnesses had observed abused treatment of students," and cautioned that defendant's "administrators had repeatedly refused to investigate or follow mandatory reporting procedures." *Id.* Superintendent Gemmill did not respond. *Id.* Around this time, plaintiff's NERIC e-mail account began malfunctioning: e-mails disappeared, messages bounced, and her sent-mail folder intermittently vanished. *Id.* ¶ 36. Plaintiff reported these problems but they were not investigated. *Id.* ¶¶ 36–37.

Shortly thereafter, HR Director Yamin contacted plaintiff and explained that the only way to initiate an appeal "was for Plaintiff to meet directly with [defendant's] counsel Kevin Hickey." Dkt. No. 39 ¶ 31. "Plaintiff stated she wanted to appeal but did not feel safe speaking with opposing legal counsel without representation." *Id.* "Around this time, Plaintiff's NERIC email account became flagged, as later shown in exhibits submitted at her [Civil Service Law] § 75 hearing." *Id.* According to plaintiff, HR Director Yamin told her that she could meet with an "independent" investigator named Concetta Galvin instead. *Id.* ¶ 32. HR Director Yamin assured plaintiff that Galvin "had no ties to BOCES and would provide an unbiased review of Plaintiff's reports." *Id.* But plaintiff later learned that Galvin was not "independent at all—Galvin held an active NERIC account and was employed as an itinerant administrator for BOCES." *Id.* ¶ 33.

On November 4, 2024, plaintiff met with Investigator Galvin. Dkt. No. 39 ¶ 34. Plaintiff "again disclosed specific abuse incidents, safety violations, and the severe emotional toll caused by BOCES's failure to act." *Id.* According to plaintiff, Investigator Galvin "removed or changed key abuse disclosures" that plaintiff made during this meeting. *See id.* ¶ 35.

On December 6, 2024, Superintendent Gemmill sent plaintiff a letter "falsely stating" that she had "abandoned" her position as of December 6, 2024, because plaintiff "had supposedly failed

to report absences between December 2 and December 6." Dkt. No. 39 ¶ 37. According to plaintiff, this letter "ignored Plaintiff's prior emails reporting her absences and was based on incomplete or missing email records caused by the same [e-mail] interference Plaintiff had reported." *Id.*

On December 9, 2024, defendant's Business Office Director Wendy Ashley issued plaintiff the first of two $1,800 "clawback" demands. Dkt. No. 39 ¶ 38. Plaintiff insists that these demands were improper because she never resigned or abandoned her position. *Id.* According to plaintiff, these demands were issued after she made her "protected reports and accommodation requests." *Id.* In plaintiff's view, these demands "marked the beginning of a coordinated effort to build a false narrative that Plaintiff had voluntarily separated from employment." *Id.* In fact, according to plaintiff, defendant produced a "December 10 email attributed to Plaintiff" that had been "fabricated" or "altered" to falsely show that plaintiff had not reported her absences during the first week of December. *Id.* ¶ 39.

On December 16, 2024, HR Director Yamin sent plaintiff a second letter that "falsely" asserted that there was no record of plaintiff reporting her absences between December 2 and 6 and that stated plaintiff's claims against her co-workers had been "investigated" and deemed "unfounded." Dkt. No. 39 ¶ 40. This letter informed plaintiff that defendant "would treat her separation as a 'voluntary resignation,' and threatened disciplinary charges for 'abandonment' if she denied resigning." *Id.* According to plaintiff, HR Director Yamin's letter relied on the fabricated December 10 e-mail falsely attributed to plaintiff. *Id.*

On December 17, 2024, plaintiff received a COBRA cancellation packet that falsely stated that defendant's Board "will approve your resignation, effective December 6, 2024." Dkt. No. 39 ¶ 41. Plaintiff denies that she ever submitted a resignation. *Id.* According to plaintiff, defendant's issuance of this COBRA cancellation packet "was used to manufacture the false appearance that

Plaintiff had voluntarily separated from employment." *Id.* Plaintiff alleges that this was in retaliation for her protected activity under the First Amendment and ADA. *Id.*

On December 23, 2024, defendant selected Attorney Kristen Smith as the Civil Service Law § 75 hearing officer. Dkt. No. 39 ¶ 42. According to plaintiff, this decision was made before any investigative steps were taken, before any notice was sent to plaintiff, and before any charges were drafted against her. *Id.* In plaintiff's view, this shows that defendant anticipated a "predetermined outcome" for this hearing: plaintiff's termination. *Id.* ¶¶ 42, 44. Further, because this recruitment e-mail involved defendant's former attorney in this litigation, it demonstrated a conflict of interest and "unlawful coordination among BOCES, its counsel, and the hearing officer." *Id.* ¶ 43.

On January 3, 2025, HR Director Yamin telephoned plaintiff and asked her whether she planned on returning to work. Dkt. No. 39 ¶ 45. Plaintiff "was shocked and confused" because she had already received the COBRA cancellation notice, the clawback demand, and a letter falsely stating that defendant had "approved" her resignation. *Id.* During this call, plaintiff reiterated her request for accommodations and explained that her anxiety symptoms and safety concerns prevent her from returning to the same classroom setting. *Id.* In response, HR Director Yamin "issued a direct threat," stating that "If you don't resign, we will bring charges against you and terminate you." *Id.* ¶ 46. According to plaintiff, this was "a clear act of retaliation." *Id.*

On January 14, 2025, defendant served plaintiff with Civil Service Law § 75 charges that accused plaintiff of "incompetence, misconduct, and insubordination." Dkt. No. 39 ¶ 47. According to plaintiff, the charges failed to mention plaintiff's "reports of abuse, her safety disclosures, her communication-interference complaints, or her accommodations requests." *Id.* Thus, because these charges omitted all her protected activity, they were "a retaliatory pretext." *Id.*

In February of 2025, NYSED and a co-worker notified plaintiff that her "personal Hotmail account had been rerouted without authorization to 181jocelynne@rustyload.com." Dkt. No. 39 ¶ 48. Plaintiff did not authorize this rerouting. *Id.* According to plaintiff, this occurred "during the same period BOCES was advancing the disciplinary process—directly obstructing her ability to receive notices, communicate effectively, or prepare a defense." *Id.*

On February 9, 2025, plaintiff notified defendant in writing that she was unable to attend the scheduled § 75 hearing because she was caring for a medically fragile patient. Dkt. No. 39 ¶ 49. According to plaintiff, defendant had "full knowledge" of this conflict in advance of the scheduled hearing. *Id.* Even so, Hearing Officer Kristen Smith proceeded with the hearing despite plaintiff's absence. *Id.* Plaintiff further alleges that defendant failed to serve plaintiff with its evidence packet, witness list, or exhibits before the hearing. *Id.* ¶ 50. Plaintiff did the best that she could to prepare a detailed written rebuttal with exhibits. *Id.* Plaintiff alleges that she submitted and served her rebuttal packet on both defendant's counsel and on Hearing Officer Smith before the hearing began. *Id.*

In March of 2025, plaintiff filed a FOIL request for the hearing transcript. Dkt. No. 39 ¶ 51. Although defendant's counsel represented in an e-mail that the transcript had been mailed to plaintiff on March 1, FOIL Officer Mary Bruno later confirmed that the transcript had not been mailed until March 28. *Id.* According to plaintiff, this discrepancy "undermines" defendant's credibility and "supports" plaintiff's allegation that "documents were manipulated and withheld as part of a retaliatory effort to prevent her from reviewing evidence and participating in the process." *Id.* Plaintiff alleges that the FOIL transcript revealed various improprieties tending to show that the outcome was predetermined. *Id.*

On April 4, 2025, Hearing Officer Smith issued her determination. Dkt. No. 39 ¶ 52. Later, on April 22, plaintiff received a letter from Superintendent Gemmill stating that the "BOCES Board has accepted the findings and recommendations of hearing officer Kristen Smith and terminate your employment on April 12, 2025." *Id.* ¶ 53 (error in original). According to plaintiff, her name does not appear on defendant's Board's agenda, minutes, or any related documentation for that meeting or any subsequent Board meetings. *Id.* Thus, in plaintiff's view, Superintendent Gemmill acted "with sole, final policymaking authority" in terminating plaintiff. *Id.*

Thereafter, in May of 2025, agency nurse Maryellen Pace "reported almost identical misconduct by the same staff and classroom that Plaintiff had reported." Dkt. No. 39 ¶¶ 54, 57. Principal Barbatos removed Nurse Pace from the building, refused to accept her written statement, and threatened her nursing license. *Id.* ¶¶ 55, 58. According to plaintiff, this treatment mirrored the treatment that she received, which confirmed "a pattern of retaliation against mandated reporters." *Id.* ¶¶ 56, 60.

## III. LEGAL STANDARD

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw

all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

Plaintiff's second amended complaint asserts three claims: a claim for retaliation under the ADA (Count One), a 42 U.S.C. § 1983 claim for retaliation under the First Amendment (Count Two), and a claim for retaliation under the Rehabilitation Act (Count Three). Dkt. No. 46. In the August 5, 2026 Order, the Court found that plaintiff had plausibly alleged her retaliation claims under the ADA and the Rehabilitation Act. Dkt. No. 45 at 15–18.

Defendant's latest pre-answer dismissal motion does not challenge those threshold conclusions. Even so, defendant has moved to dismiss plaintiff's ADA claim and 42 U.S.C. § 1983 claim (Count One and Count Two) and part of plaintiff's damages as to her Rehabilitation Act claim (Count Three). Dkt. No. 48. As defendant explains, there are "four discrete issues" that remain to be addressed:

> First, Plaintiff's claim under the ADA must be dismissed because the Second Amended Complaint does not allege that she exhausted her administrative remedies, which is the same defect that caused the Court to dismiss that claim in the first instance. Second, Plaintiff's claim under the First Amendment must be dismissed because Plaintiff has sued only BOCES, and she has not pleaded facts that would permit a municipal entity like BOCES to be held liable under 42 U.S.C. § 1983. Third, Plaintiff's demand for emotional distress and other non-economic damages under the Rehabilitation Act must be dismissed because those damages are not recoverable under that statute as a matter of law. Fourth, to the extent Plaintiff seeks punitive damages, that demand must be dismissed because punitive damages are not available against BOCES as a matter of law.

Dkt. No. 48-1 at 7–8.

As before, plaintiff's *pro se* status means that her filings must be held to less stringent standards than documents drafted by an attorney. *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012). Indeed, as the Second Circuit has repeatedly explained, pro se filings must be "construed liberally" with "special solicitude" and interpreted to raise the strongest claims that they suggest. *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013). "This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

With that solicitude in mind, the Court proceeds to defendant's latest set of arguments.

**1. ADA & Exhaustion**

First, defendant argues that plaintiff's ADA claim must be dismissed because the second amended complaint does not plausibly allege that she exhausted her statutory administrative remedies prior to filing this suit. Dkt. No. 48-1 at 11. Defendant acknowledges that exhaustion is an affirmative defense but maintains that it may be adjudicated at the pleadings stage where, as here, it is clear from the face of the complaint and supporting documents that proper exhaustion has not occurred. *Id*. According to defendant, this is the same defect that caused the Court to dismiss plaintiff's ADA claim without prejudice to repleading in the first instance. *Id*. at 11–13.

In opposition, plaintiff explains that she has invoked the administrative process by filing an administrative complaint, which has been accepted by the New York State Division of Human Rights ("NYSDHR") and assigned a charge number by the Equal Employment Opportunity Commission ("EEOC"). Dkt. No. 50 at 4. Although plaintiff concedes that she has not been issued a right-to-sue letter by an administrative agency, she argues that exhaustion is not a jurisdictional prerequisite and that therefore her lack of exhaustion "may be cured where a right-to-sue notice is subsequently obtained while the action remains pending." *Id*. at 5. Plaintiff contends that even if

the Court were to conclude that dismissal was warranted, the dismissal should be without prejudice. *See id.* at 6–7.

Defendant replies by pointing out that plaintiff does not claim that she has, in fact, fully exhausted her administrative remedies with respect to this claim. Dkt. No. 53 at 6. Instead, defendant emphasizes that plaintiff is essentially seeking to be excused from this legal requirement at the pleadings stage. Dkt. No. 53 at 6. Defendant again acknowledges that in certain circumstances the question of exhaustion can be saved for later motion practice but maintains that circuit precedent permits a trial court to dismiss without prejudice an ADA claim on lack-of-exhaustion grounds at the pre-answer stage when it is clear from the face of the pleading and other documents that exhaustion has not yet occurred. *Id.* at 7–8.

Defendant is correct. First, as defendant points out, the November 14 Order explained to plaintiff the exhaustion requirement that applies to ADA claims:

> The ADA requires a plaintiff to exhaust her administrative remedies before filing suit in federal court. 42 U.S.C. § 12117(a). Generally, this entails filing a timely complaint with the EEOC or the appropriate state or local agency and then receiving a so-called "right to sue" letter. *See, e.g.*, *Soules v. Conn. Dep't of Emer. Servs. & Pub. Prot.*, 882 F.3d 52, 57 (2d Cir. 2018).
>
> Exhaustion is an affirmative defense, *Zerilli-Edelglass v. N.Y. City Trans. Auth.*, 333 F.3d 74, 80 (2d Cir. 2003), which means that a plaintiff is not necessarily required to demonstrate it at the pleadings stage, *Jones v. Bock*, 549 U.S. 199, 216 (2007). Even so, pre-answer dismissal on exhaustion grounds may be appropriate when it is clear from the face of the complaint and other incorporated documents that a plaintiff has not exhausted her administrative remedies prior to filing suit. *See, e.g.*, *Hendrix v. Pactiv LLC*, 488 F. Supp. 3d 43, 52 (W.D.N.Y. 2020).

*Beaver*, 2025 WL 3182723, at *7–*8.

This remains an accurate statement of the law. In the November 14 Order, the Court dismissed plaintiff's ADA claims without prejudice because the operative pleading and supporting submissions indicated that her administrative complaint was still pending at that time. *See Beaver*,

2025 WL 3182723, at *8. The same is true today: plaintiff's opposition submission explicitly acknowledges that, at least as of July 31, 2026, her administrative complaint remains pending and that she has not yet received a right-to-sue letter. Dkt. No. 50 at 4.

In other words, the available record is clear that plaintiff has not yet exhausted her ADA claims. Proper exhaustion requires a claimant to have "filed a timely complaint with the [relevant administrative agency] and obtained a right-to-sue letter." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001). This exhaustion requirement "applies to *pro se* and counseled plaintiffs alike." *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015).

To be sure, plaintiff is correct that exhaustion is not a "jurisdictional prerequisite." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). But exhaustion is still a "precondition to suit." *Hardaway v. Hartford Public Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018). What this technical legal distinction really means is that a plaintiff's non-exhaustion *can* be subject to equitable defenses in appropriate cases. *See, e.g.*, *Tillman v. Luray's Travel*, 137 F. Supp. 3d 315, 326–27 & n.9 (E.D.N.Y. 2015) (explaining these defenses).

Upon review, none of the available equitable defenses would apply, certainly not at this time. Plaintiff has represented that she has been able to access and utilize the administrative agency's complaint procedures and is pursuing that process to completion. Under these circumstances, the appropriate remedy is a dismissal *without* prejudice. Accordingly, defendant's motion to dismiss plaintiff's ADA retaliation claim (Count One) will be granted.

**2. 42 U.S.C. § 1983 & Municipal Liability**

Second, defendant argues that plaintiff's 42 U.S.C. § 1983 claim for retaliation under the First Amendment must be dismissed because plaintiff's second amended complaint does not plausibly allege a municipal liability claim against BOCES. Dkt. No. 48-1 at 13. As defendant points

out, the November 14 Order explained to plaintiff the general distinction between individual and municipal liability in the context of a § 1983 claim. *Id*. at 13–14. Despite being on notice that she was either required to name one or more individual defendants or plausibly allege a "policy or custom" attributable to BOCES, defendant argues that plaintiff's second amended complaint fails to plausibly allege a municipal liability claim under any of the constitutional theories recognized by the Supreme Court. *See id*. at 14–19.

In opposition, plaintiff argues that she has in fact plausibly alleged a municipal liability claim under 42 U.S.C. § 1983 because the second amended complaint alleges that defendant's board was on constructive notice of her "protected reporting and retaliation allegations" by virtue of its "senior administrative and governing structure" yet voted to accept the hearing officer's findings and approve her termination. Dkt. No. 50 at 8–14. In plaintiff's view, the second amended complaint plausibly alleges a municipal liability claim based on either a single incident by a final policymaker, *id*. at 9–14, or a recurring institutional practice evidenced in part by the senior administration's failure to respond appropriately to plaintiff's reports, *id*. at 14–22.

Defendant replies that plaintiff's opposition includes new or additional factual allegations that "materially depart" from what she has stated in her second amended complaint. Dkt. No. 53 at 9–10. According to defendant, even if the Court accepts these amended assertions in light of plaintiff's *pro se* status, plaintiff's new or additional factual allegations are still insufficient to plausibly allege a municipal liability claim under any of the available theories. *See id*. at 10–13.

Defendant is again correct. First, as before, the November 14 Order explained to plaintiff how to appropriately allege her desired federal constitutional claims, whether against individual actors or against her former employer:

> The applicable body of law for these claims is 42 U.S.C. § 1983, which is the procedural vehicle used to enforce a plaintiff's constitutional rights. *See, e.g.*, *Gonzaga*

> *Univ. v. Doe*, 536 U.S. 273, 285 (2002). But because the constitution's individual guarantees only operate against the government, *Lindke v. Freed*, 601 U.S. 187, 195 (2024), the § 1983 statute can only reach "state action" by state actors, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001). In other words, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).
>
> This makes § 1983 different than the ADA or the Rehabilitation Act. In the employment context, those statutes protect plaintiff-employees from defendant-employers. But § 1983 is not focused on the employment relationship. Instead, "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).
>
> This means the appropriate defendant in a § 1983 action is usually the individual state or local official who personally deprived the plaintiff of a constitutional right. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (citation omitted) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault."), *cert. denied*, 520 U.S. 1230 (1997); *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) ("To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation.").
>
> Plaintiff has not named any individual as a defendant. Although she does reference a co-worker, teachers, and several people who might be managers or supervisors, the complaint does not allege in any level of meaningful detail what one or more of these individuals personally did or refused to do that might have deprived plaintiff of a constitutional right.
>
> Although there are a few situations in which an entity is the appropriate defendant for a § 1983 claim, *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013), a municipal entity "cannot be held liable under § 1983 merely because it happened to employ the alleged tortfeasor." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020). Instead, the plaintiff must allege that a policy or custom attributable to defendant caused that entity's representative to commit the alleged constitution violation. *See Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011). Absent a policy or custom as the driving force behind the harm, a § 1983 claim should be brought against the individual who committed the allegedly wrongful act.

*Beaver*, 2025 WL 3182723, at *10–*11

As before, this remains an accurate statement of the law. Plaintiff has since amended her complaint—twice. But instead of naming any of the individual defendants who might have

committed a constitutional harm, plaintiff has chosen to assert her 42 U.S.C. § 1983 First Amendment retaliation claim against her former employer, Capital Region BOCES.[3] Accordingly, the question is whether plaintiff has plausibly alleged a claim for municipal liability.

Plaintiff's municipal liability claim is premised on allegations of retaliation in violation of the First Amendment. To state a First Amendment retaliation claim, a plaintiff must plausibly allege that: (1) she engaged in speech or conduct protected by the First Amendment; (2) the defendant took an adverse action against her; and (3) there was a causal connection between the protected activity and the adverse action. *See, e.g.*, *Long v. Byrne*, 146 F.4th 282, 291 (2d Cir. 2025). As relevant here, the First Amendment protects public employees when they engage in speech on matters of public concern. *See, e.g.*, *Heim v. Daniel*, 81 F.4th 212, 223 (2d Cir. 2023).

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality (or other "local government unit," such as BOCES) could be held liable under 42 U.S.C. § 1983 if a plaintiff shows "that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of N.Y.*, 914 F.3d 727, 756 (2d Cir. 2019). "The policy or custom need not be memorialized in a specific rule or regulation," *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996), and may be "reflected in either action or inaction," *Cash v. County of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011). The Supreme Court has recognized that *Monell* liability may be established through:

> (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are

[3] To be sure, the Court can imagine a host of reasons that § 1983 claims in this case might not be viable against the individual actors. An individual-capacity § 1983 damages claim triggers the requirement of a defendant's "personal involvement" in the alleged constitutional wrong, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (collecting cases), and implicates the doctrine of "qualified immunity," an affirmative defense that has been judicially crafted to shield public officials who make reasonable-but-mistaken judgment calls in gray areas where the law is unsettled, *see, e.g.*, *Tripathy v. McKoy*, 103 F.4th 106, 116 (2d Cir. 2024). In any event, plaintiff was on notice of the basic requirements and chose to pursue this claim against BOCES.

> not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to 'deliberate indifference' to the rights of those who come into contact with the inadequately trained or supervised municipal employees.

*Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (quoting *Deferio v. City of Syracuse*, 770 F. App'x 587, 590 (2d Cir. 2019) (summary order)).

Importantly, however, the Supreme Court has intentionally made these so-called "*Monell*" claims hard to plead and hard to prove. Unlike state tort law, vicarious theories of liability (such as *respondeat superior*, where an employer can be held responsible for the wrongful acts of its employees or agents) are unavailable in the § 1983 context. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Instead, as the Supreme Court has explained, "under § 1983, local governments are responsible only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (cleaned up).

This rule sounds straightforward enough. But it is often pretty confusing in practice. For instance, the Court agrees with plaintiff that her submissions (in her second amended complaint and in her limited supplemental filing at Dkt. No. 54) are sufficient to plausibly establish that defendant's board possessed "final authority" over her removal, that defendant's "senior administrators" were on notice that plaintiff had made "protected[ ]reporting and retaliation allegations," and that defendant's board nevertheless voted to accept the civil service hearing officer's determination, which involved findings of "incompetence, insubordination, and misconduct."

But even taken as true, these things do not plausibly establish *Monell* liability. "*Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Liability under section 1983 is imposed on the

municipality when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Id.*

In other words, it is not enough to have plausibly alleged that, at one point, one or more of the municipal entity's officials committed a constitutional wrong (such as by taking an adverse action against you for engaging in protected speech by, for instance, falsely disciplining you) and that, at a later point, the municipal entity's governing board took some other action against you (such as by voting in favor of your termination based on a third-party hearing officer's findings and recommendations). Instead, a plaintiff would need to plausibly allege that defendant's governing body had some kind of (almost certainly unwritten) policy or custom of intentionally terminating or punishing employees who engaged in protected speech and that the subordinate municipal officials were acting pursuant to that policy or custom at the time in which they engaged in the specific claimed retaliation.

Stated somewhat differently, there are at least a couple problems with plaintiff's *Monell* claim. First, it is bottom-up rather than top-down. Plaintiff has not offered any plausible basis on which to conclude that any of defendant's board, or any of its members, were engaged in, or directed others to engage in, the intentional retaliation about which plaintiff has complained. Instead, plaintiff has alleged that senior-but-subordinate officials falsely disciplined her and eventually sought her termination under Civil Service Law § 75, which resulted in a state-law hearing by an independent hearing officer who made findings and issued a recommendation to defendant's board, which voted to ratify the hearing officer's determination.

This, by itself, might not necessarily be fatal to plaintiff's claim at the pre-answer stage. For instance, *Monell* liability can sometimes be premised on actions by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have

been aware of them. Plaintiff argues that this avenue for liability has been established by her pleading's allegations of a "recurring method of institutional response," supported by evidence than another employee who spoke out in a similar fashion suffered the same treatment by defendant's senior employees. But the applicable case law makes clear that this is a difficult theory of liability to establish, even at the pleading stage. *See, e.g.*, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128 (1988). And after considering the matter, the Court concludes plaintiff has not done so.

Notably, however, plaintiff's second amended complaint alleges that the "independent" civil service hearing officer was not acting independently or neutrally—she was defendant's former attorney—and therefore she may have presented false, inaccurate, or perhaps predetermined findings to defendant's board, which may have rubber-stamped them. This is something called a "cat's paw" theory of liability, where "a final decisionmaker that relies entirely on an improperly motivated recommendation from a subordinate may render the municipality liable because the subordinate, although not formally delegated the power to make decision, acts as the municipality's agent." *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011).

The Second Circuit has endorsed this theory of liability for retaliation claims under Title VII. *Vasquez v. Empress Ambulance Serv.*, 835 F.3d 267, 272–73 (2d Cir. 2016). But the Second Circuit has not greenlit this theory of liability for 42 U.S.C. § 1983 claims in general, let alone for *Monell* liability in particular. And if anything, relevant circuit precedent is headed in the exact opposite direction. *See Naumovski v. Norris*, 934 F.3d 200, 222 (2d Cir. 2019) ("Section 1983 claims for discrimination in public employment cannot be based on a *respondeat superior* or 'cat's paw' theory to establish a defendant's liability."); *Levine v. N.Y. State Police*, 2022 WL 1987845, at *15 (N.D.N.Y. June 6, 2022) (Sannes, J.) (holding cat's paw theory of liability inapplicable to § 1983 claims).

Second, even if the Court were to resolve this lingering doctrinal ambiguity in plaintiff's favor, her *Monell* claim would still be subject to dismissal because the second amended complaint and other submissions do not plausibly establish that defendant had a written or unwritten policy or custom that operated as the "moving force" behind this series of events. Although plaintiff vociferously argues otherwise, the Court concludes that the collective effort by senior officials to falsely discipline and then terminate plaintiff—assuming for now that such an intentional effort to do so existed—has not been sufficiently tied to the municipal entity itself through one of the four methods recognized in *Monell* and its progeny. Accordingly, defendant's motion to dismiss plaintiff's 42 U.S.C. § 1983 claim (Count Two) must be granted.

**3. Non-Economic Damages & the Rehabilitation Act**

Third, defendant argues that plaintiff's demand for non-economic damages under the Rehabilitation Act must be dismissed because those damages are not recoverable under that statute as a matter of law. Dkt. No. 48-1 at 20. According to defendant, the Supreme Court held in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022), that emotional-distress damages are unavailable under statutes enacted pursuant to the Spending Clause, which includes Section 504 of the Rehabilitation Act. Dkt. No. 48-1 at 20. As defendant explains, this conclusion would limit plaintiff's Rehabilitation Act claim to damages for lost wages and benefits and help sharpen the focus of discovery in this case. *Id*. at 20–21.

In opposition, plaintiff acknowledges that *Cummings* "bars emotional-distress damages under Spending Clause statutes such as Section 504" and represents that she "does not seek such damages under Count III to the extent prohibited by *Cummings*." Dkt. No. 50 at 22. However, plaintiff maintains that she can still validly pursue "other legally available relief, including lost wages, employment benefits, recoverable out-of-pocket losses, and appropriate equitable relief."

*Id.* at 22–23. In plaintiff's view, it would be premature to "restrict discovery concerning emotional injuries, medical treatment, and related matters" because those matters may be relevant to her ADA and/or 42 U.S.C. § 1983 claims. *Id.* at 23.

Defendant replies by emphasizing that plaintiff concedes that *Cummings* forecloses any claim for emotional-distress damages under the Rehabilitation Act. Dkt. No. 53 at 13–14. However, defendant points out that plaintiff's second amended complaint also seeks "other non-economic damages" in the form of reputational harm, which is a form of damages that are likewise unavailable under the statute in the wake of *Cummings*. *Id.* at 14.

The Rehabilitation Act, which prohibits federal funding recipients from discriminating on the basis of disability, incorporates the rights and remedies provided under Title VI. 29 U.S.C. § 794a(a)(2). Notably, however, Congress enacted the Rehabilitation Act pursuant to its authority under the Spending Clause. Because Spending Clause legislation operates "much in the nature of a *contract*," the Supreme Court has applied a "contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (cleaned up).

This contract-law analogy means that, as a general rule, a federal funding recipient is deemed to be on notice that, "for breaching its Spending Clause 'contract' with the Federal Government, it will be subject to the *usual* contract remedies in private suits." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 221 (2022). This includes things like "compensatory damages and injunctive relief" but excludes, "for example, punitive damages." *Doherty v. Bice*, 101 F.4th 169, 174 (2d Cir. 2024) (extending Spending Clause limitation to claims under Title II of the ADA). In *Cummings*, the Supreme Court relied on this general rule to hold that "emotional distress damages are not recoverable" under the Rehabilitation Act. 596 U.S. at 230.

The Court understands the parties to agree that, consistent with the Supreme Court's holding in *Cummings*, plaintiff may recover economic damages (such as lost wages and benefits) in the event that she prevails on her Rehabilitation Act claim. *Cummings* tends to support the conclusion that plaintiff may not, however, recover non-economic damages, which include subjective non-monetary losses such as emotional distress or injury to reputation.[4] *Cf. Papaleontiou v. Nat'l Ass'n of Bds. of Pharm.*, 2026 WL 1864122, at *9–*10 (E.D.N.Y. June 29, 2026) (striking demand for emotional distress, physical injury, and reputational harm because those damages are generally unavailable in a breach-of-contract action).

In sum, plaintiff's second amended complaint seeks damages for "lost wages, lost employment benefits, emotional distress, reputational harm, and all other economic and non-economic losses recoverable under the . . . . Rehabilitation Act." But *Cummings* makes clear that plaintiff cannot use her remaining Rehabilitation Act claim (Count Three) to recover emotional distress damages. And there is no basis on which to conclude that reputational harm might be properly recovered under the Rehabilitation Act, either. Accordingly, defendant's motion to preclude these categories of damages will be granted.

**4. Punitive Damages & BOCES**

Fourth, defendant argues that to the extent plaintiff's second amended complaint seeks punitive damages against BOCES, that demand must be dismissed because punitive damages are not

---

[4] To be clear, the Court declines to hold that *Cummings*, or an application of its contract-law-analogy reasoning, necessarily forecloses all possible forms of non-economic damages under the Rehabilitation Act. *Cummings* itself held only that emotional distress damages were unavailable under the Act. And lower federal courts applying *Cummings* have held that plaintiffs are not always barred "from recovering specific categories of compensatory damages" under the Rehabilitation Act. *Mullen v. Claps*, 2024 WL 989399, at *7 (D. Colo. Mar. 7, 2024) (collecting cases); *see also Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 749 F. Supp. 3d 290, 302 (N.D.N.Y. 2024) (rejecting as overbroad defendants' argument that "compensatory damages are not available under the Rehabilitation Act" in the wake of *Cummings*).

available against BOCES as a matter of law. Dkt. No. 48-1 at 21. In opposition, plaintiff concedes that "punitive damages are unavailable against BOCES." Dkt. No. 50 at 24.

The parties are correct. Punitive damages are unavailable against a municipal entity under 42 U.S.C. § 1983, the ADA, or the Rehabilitation Act. *Barnes v. Gorman*, 536 U.S. 181, 189–90 (2002) (holding that punitive damages are not available under the ADA or the Rehabilitation Act); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding same as to municipal entities under 42 U.S.C. § 1983). Accordingly, defendant's motion to preclude these categories of damages will be granted.

## V. CONCLUSION

Defendant's partial motion to dismiss will be granted.

Therefore, it is

ORDERED that

1. Plaintiff's motion for leave to file a "limited supplemental submission" (Dkt. No. 54) is GRANTED;

2. Defendant's partial motion to dismiss (Dkt. No. 48) is GRANTED;

3. Plaintiff's ADA claim (Count One) is DISMISSED without prejudice;

4. Plaintiff's 42 U.S.C. § 1983 claim (Count Two) is DISMISSED;

5. Plaintiff's Rehabilitation Act claim (Count Three) REMAINS for discovery; and

6. Defendant shall file and serve a responsive pleading within FOURTEEN DAYS of the date of this opinion.

The Clerk of the Court is directed to terminate the pending motions and set a deadline accordingly.

**IT IS SO ORDERED.**

Dated: November 13, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge